[No. B222880. Second Dist., Div. Three. Nov. 9, 2011.]

ASHLEY JOFFE et al., Plaintiffs and Appellants, v.
CITY OF HUNTINGTON PARK et al., Defendants and Respondents.

## COUNSEL

Law Office of Kent M. Bridwell and Kent M. Bridwell for Plaintiffs and Appellants.

Richards, Watson & Gershon, T. Peter Pierce, Regina N. Danner and Andrew Brady for Defendants and Respondents.

## OPINION

**CROSKEY, J.**—The plaintiffs, Ashley Joffe (Joffe) and Plycraft Industries, a California corporation (Plycraft) (collectively, plaintiffs) appeal from the judgment of dismissal entered by the trial court following its order sustaining without leave to amend the demurrer of two defendants[1] to plaintiffs' cause of action for inverse condemnation.[2]

This case raises issues concerning the application of the Supreme Court's landmark decision in *Klopping v. City of Whittier* (1972) 8 Cal.3d 39 [104

---

[1] Defendants and respondents in this case are City of Huntington Park (City) and Huntington Park Community Development Commission (CDC), collectively hereafter referred to as the City defendants. Defendants El Centro Huntington Park L.L.C., Festival Western Development L.L.C., and Polar Partners (collectively, the developer defendants) are not parties to this appeal.

[2] Plaintiffs had also pled a cause of action for nuisance against defendants that was not affected by the demurrer. That cause of action, however, was subsequently dismissed as to the City defendants.

Cal.Rptr. 1, 500 P.2d 1345] (*Klopping*). Plaintiffs claimed that the City defendants had effectively destroyed their furniture business and caused a devaluation of their property by publicly and privately expressing an intent to acquire that property. The City defendants ultimately did not proceed with such condemnation, however, and plaintiffs filed this action to recover damages on a theory of inverse condemnation.[3]

In *Klopping*, the Supreme Court held that "a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping, supra*, 8 Cal.3d at p. 52.)

The trial court ultimately sustained the City defendants' demurrer to plaintiffs' pleading without leave to amend on the ground that plaintiffs had not and could not allege that the City defendants had ever made an announcement of an intent to condemn. We agree, and therefore affirm.

### *FACTUAL AND PROCEDURAL BACKGROUND*[4]

Plaintiff Joffe is the fee owner of the real property located at 2100–2148 East Slauson Avenue in the City of Huntington Park. At that location, he has, for a number of years, been conducting a furniture manufacturing business. Joffe conducts this business through his wholly owned corporation, plaintiff Plycraft. Such furniture is made to order requiring long and predictable lead times between the receipt of the order and the contractually promised dates of delivery.

Beginning in 2002, the City defendants and the developer defendants repeatedly expressed the intent and desire to acquire and develop two adjacent 40-acre sites for the purpose of building and developing 920,000 square feet of buildings which would include numerous retailers, shops and restaurants. The proposed project was anticipated to cost $255 million and

---

[3] Alternatively, plaintiffs also argue that the facts that they have alleged justify recovery under the additional theories of equitable estoppel and promissory estoppel. They argue that the title of their cause of action (inverse condemnation) is not determinative if the facts alleged actually state a cause of action on any theory. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 870 [62 Cal.Rptr.3d 614, 161 P.3d 1168].)

[4] As this case comes to us on demurrer, the facts we recite are taken from the allegations of plaintiffs as set out in their second amended complaint, the operative pleading herein, plus those assertions of additional allegations that they advised the trial court that they could truthfully allege if given an opportunity to file a third amended complaint.

was intended to generate $3.5 million in annual sales tax and $1 million in annual property tax revenues while creating 1,800 new jobs. The two 40-acre parcels, taken together, generally included the area bounded by Alameda Street to the west, Slauson Avenue to the north, Randolph Street to the south and Santa Fe Avenue to the east. It specifically included the property owned by Joffe, where Plycraft conducted its furniture manufacturing business. The project development was designated "El Centro de Huntington Park" (hereafter, the project).

During the period 2002 through 2008, plaintiffs were repeatedly informed by both the City defendants and the developer defendants that the project was on track and that Joffe's property was going to be acquired by the City defendants and utilized as part of the project. Specifically, plaintiffs allege that:

1. The City defendants and developer defendants caused Joffe's property and business to be appraised;

2. The City defendants and developer defendants caused Plycraft's business to be analyzed for relocation;

3. The City defendants requested that plaintiffs obtain an appraisal so that the City defendants could enter into negotiations with plaintiffs to purchase both the property and the business;

4. The City defendants and the developer defendants erected large signs in the vicinity of Joffe's property announcing the project;

5. In both written and oral communications, the City defendants stated that Joffe's property would be acquired for the project either voluntarily or involuntarily:

(a) Around March 15, 2004, Joffe met with Juan "John" R. Noguez, the Mayor of the City of Huntington Park, and two representatives of the CDC. The meeting was called to discuss the inclusion of Joffe's property in the project. Mayor Noguez (the Mayor) told Joffe that the City defendants were going to break ground in six months, that they wanted to buy the property, but they would condemn the property if Joffe would not sell it. The Mayor "made it absolutely clear that they were going to acquire [Joffe's] property one way or another. Either [Joffe] would sell the property to [the City defendants] or they would use eminent domain to take it" from him. These

statements were likely known to members of the City Council of the City of Huntington Park, but they never objected or disagreed.[5]

(b) On November 10, 2004, the City Manager of Huntington Park wrote in an application, on behalf of the City defendants, for an EPA hazardous substance grant that, "[a]s part of the Agreement between the developer and the CDC, the developer must make a best effort to acquire as much of the project property as possible during a given period of time, after which Redevelopment Agency, through its powers of eminent domain, *will* acquire remaining property."[6] (Plaintiffs' italics.)

(c) In his cover letter of November 10, 2004, accompanying the grant application, the city manager also wrote that "the City of Huntington Park is ready to act and participate in this new outlook [(i.e., the recognition that low-income neighborhoods would support and be well served by the development of new modern retail businesses)] through the development of a new 80 plus acre development project."

6. During the entire period prior to the filing of this action, the City defendants and developer defendants have continually expressed their present and specific intent to build and develop the project. They have never disavowed their oft repeated expressions of intent to acquire Joffe's property. Yet, the project has not proceeded nor have the City defendants acquired plaintiffs' property.

The actions of the City defendants in making the announced interest and failing to proceed to acquire plaintiffs' property directly and specifically interfered with plaintiffs' use and enjoyment of that property in the following particulars:

1. Plycraft, as the tenant of Joffe, was unable to conduct its furniture manufacturing business at the property as necessary in a manner to allow it to

---

[5] This is part of the proposed allegations that plaintiffs advised the trial court would be included in a third amended complaint if they were permitted to file one. The quotation of the exact statement attributed to the Mayor is taken from Joffe's declaration in support of the application for leave to amend.

[6] Plaintiffs attached a copy of this grant application letter to their second amended complaint. The application indicates that while the City would provide a fraction of the funding for the project, the developer "will be providing $24.4 million in equity and $116 million in debt. The big box and other national tenants will be providing $86 million in funding for construction and furniture, fixtures and equipment." The application refers to a "line-up of national tenants that are currently in discussions with the developer and have submitted letters of interest." It does not indicate any *commitment* on the part of any such interested tenant to establish a retail store at the project or to provide funding for it, nor whether the developer has a commitment for the $116 million loan it anticipates obtaining.

remain profitable. Prior to the City defendants' announced intent to condemn, Plycraft had certainty of possession because Joffe is a principal of Plycraft. After the announced intent, Plycraft had no certainty of possession and was instead specifically and directly told by the City defendants' representatives that it would be relocated for the project. Plycraft is a furniture manufacturing business and Plycraft's business practices require it to obtain orders well in advance of production to properly tool for such orders and ensure delivery upon time-critical deadlines. Without certainty of long-term possession, Plycraft could not ensure completion of orders according to such time-specific requirements. In addition, Plycraft's customers who became aware of the announced project based on public information and public signs regarding the project inquired of Plycraft concerning its ability to ensure timely delivery of orders. In responding truthfully that the duration of occupancy at the property was uncertain in light of the City defendants' announced intent, Plycraft was unable to procure orders. This, in turn, caused Plycraft's profitability to deteriorate to the point of lost profits and goodwill and, ultimately, an inability to pay its rent obligation for the property. Plycraft's goodwill was lost as a result.

2. As a direct and proximate result, and in reliance upon the City defendants' representatives' statements and conduct, Plycraft was forced out of business at that location. By way of example, it was unable to enter into any long-term furniture contracts with major warehouse-style retailers because of the uncertainty of not knowing whether it would be able to fulfill contractual delivery requirements. Said contracts typically had significant damage recovery clauses in the event of nonperformance. Such penalty clauses could have caused Plycraft further and irreparable damage.

3. Joffe, unable to collect fair market rent from Plycraft, attempted to find other tenants and occupants for the property in an effort to obtain a return on the property. Although Joffe worked with brokers and agents in seeking tenants, when prospective tenants asked about the term of occupancy that was available, Joffe truthfully answered that the duration was uncertain due to the announced intent of the City defendants to utilize eminent domain to implement the project. Joffe was directly and specifically damaged to the extent he was unable to receive fair market rent for his property.

The City defendants demurred to each of plaintiffs' three successive pleadings, all essentially on the same ground. They argued successfully that these allegations, whether singularly or read as a whole, were not sufficient to satisfy the requirement of *Klopping* that there be an "announcement of intent to condemn." The court therefore sustained the demurrer of the City defendants to the second amended complaint *without* leave to amend. Thereafter, a judgment of dismissal was entered and plaintiffs filed this timely appeal.

## CONTENTIONS OF THE PARTIES

Plaintiffs[7] argue that they have pleaded sufficient facts to state a claim for inverse condemnation under the *Klopping* rule. They contend that (1) the alleged repeated statements and conduct of the City defendants, when viewed in their totality, were sufficient to constitute an "announcement of intent to condemn," justifying recovery for an unreasonable delay following the announcement; (2) the alleged acts and conduct of the City defendants constituted *unreasonable* conduct recognized by *Klopping* as an alternative theory of recovery to postannouncement unreasonable delay; and (3) the alleged acts and conduct of the City defendants were also sufficient to state a cause of action for recovery under a theory of either equitable or promissory estoppel.[8]

## DISCUSSION

### 1. *Standard of Review*

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

"However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave

---

[7] For purposes of simplicity and clarity, we generally hereafter refer to plaintiffs jointly as their legal claims and arguments in this matter are identical even though, as shown above, they are different legal entities and allegedly sustained different types of injury.

[8] Plaintiffs also argue that the trial court abused its discretion in denying them leave to amend their second amended complaint. We need not specifically discuss that issue as our analysis of their case has proceeded on the assumption that all of the facts which plaintiffs offered to include in such amended pleading were in fact considered by the trial court and are considered by us in the evaluation of plaintiffs' claims against the City defendants.

to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) "While the decision to sustain or overrule a demurrer is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501 [82 Cal.Rptr.2d 368].) "To meet [the] burden of showing abuse of discretion, the plaintiff must show how the complaint can be amended to state a cause of action. [Citation.] However, such a showing need not be made in the trial court so long as it is made to the reviewing court." (*William S. Hart Union High School Dist. v. Regional Planning Com.* (1991) 226 Cal.App.3d 1612, 1621 [277 Cal.Rptr. 645].)

### 2. Inverse Condemnation

The Fifth Amendment to the United States Constitution provides that private property may not be taken for public use without the owner receiving "just compensation." (U.S. Const., 5th Amend.) The provisions of the California Constitution contain somewhat broader protection: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. . . ." (Cal. Const., art. I, § 19, subd. (a).) Over the years, both of these provisions have been expanded by judicial decision. For instance, "[t]he concept of 'taking' has with time changed from the notion of a physical seizure to that of a diminution of the owner's rights and attributes of ownership. The question in eminent domain proceedings therefore is not what the taker has gained, but what the owner has lost. [Citations.]" (*Tilem v. City of Los Angeles* (1983) 142 Cal.App.3d 694, 702 [191 Cal.Rptr. 229].)

The doctrine of "inverse condemnation" has evolved to advance these rights where private property is taken or damaged by governmental action, but where the responsible public entity does not initiate proceedings in eminent domain. (*D & M Financial Corp. v. City of Long Beach* (2006) 136 Cal.App.4th 165, 176 [38 Cal.Rptr.3d 562].)

Before we discuss *Klopping* and its progeny, it is useful to discuss the procedures governing eminent domain in California. "The power of eminent domain may be exercised to acquire property for a proposed project only if all of the following are established: [¶] (a) The public interest and necessity require the project. [¶] (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (c) The property sought to be acquired is necessary for the project." (Code Civ. Proc., § 1240.030.) An eminent domain proceeding is "commenced" by filing a complaint in court. (Code Civ. Proc., § 1250.110.)

However, there are several requirements with which a public entity must comply before commencing an eminent domain proceeding.

Preliminarily, California law requires that "to the greatest extent practicable," public entities seeking to acquire private property shall be guided by a certain set of provisions of the Government Code. (Gov. Code, § 7267.) First, the public entity "shall make every reasonable effort to acquire expeditiously real property by negotiation." (Gov. Code, § 7267.1, subd. (a).) To this end, the real property "shall be appraised" prior to "the initiation of negotiations," and the owner shall be given an opportunity to accompany the appraiser during his or her inspection of the property. (Gov. Code, § 7267.1, subd. (b).) Second, the public entity "shall make an offer" to the owner to acquire the property for an amount it believes to be just compensation, an amount which shall not be less than the approved appraisal of the property's fair market value. (Gov. Code, § 7267.2, subd. (a)(1).) At the time of making the offer, the public entity shall provide the property owner "with an informational pamphlet detailing the process of eminent domain and the property owner's rights under the Eminent Domain Law." (Gov. Code, § 7267.2, subd. (a)(2).)

■ After these Government Code provisions have been met, the public entity is still not permitted to commence an action for eminent domain. Instead, it must adopt a resolution of necessity. (Code Civ. Proc., §§ 1240.040, 1245.220.) The resolution of necessity must contain several findings by the public entity, including that (1) the public interest and necessity require the project; (2) the proposed project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury; (3) the property is necessary for the proposed project; and (4) an offer, as required by Government Code section 7267.2, has been made to the owner, unless it is an emergency. (Code Civ. Proc., § 1245.230, subd. (c).) The public entity may *not* adopt a resolution of necessity unless it has given the property owner notice and an opportunity to be heard. (Code Civ. Proc., § 1245.235, subd. (a).) A property owner may challenge the validity of a resolution of necessity by petition for writ of mandate. (Code Civ. Proc., § 1245.255, subd. (a)(1).)

■ Once the resolution of necessity has been adopted, if the public entity has not commenced an eminent domain proceeding to acquire the property within six months, the property owner may bring an action in inverse condemnation to require the public entity to take the property and pay for it, and/or for damages "for any interference with the possession and use of the property resulting from adoption of the resolution [of necessity]." (Code Civ. Proc., § 1245.260, subd. (a)(2).)

Other benefits are also triggered at different points in the process. The Government Code provides for "relocation assistance" to be provided to

individuals and businesses which relocate as a result of public acquisition of their property. Those benefits are to be paid to "displaced person[s]" (Gov. Code, § 7262, subd. (a)), who are defined as those who move from their real property "[a]s a direct result of a written notice of intent to acquire, or the acquisition of, the real property." (Gov. Code, § 7260, subd. (c)(1)(A)(i).) Additionally, if a public entity "offers to purchase [property] under a threat of eminent domain," the public entity must offer the owner the reasonable costs of an independent appraisal ordered by the owner. (Code Civ. Proc., § 1263.025, subd. (a).) An offer "under a threat of eminent domain" is an offer to purchase pursuant to "any of the following: [¶] (1) Eminent Domain. [¶] (2) Following adoption of a resolution of necessity . . . . [¶] (3) Following a statement that the public entity may take the property by eminent domain." (Code Civ. Proc., § 1263.025, subd. (b).)

### 3. *The* Klopping *Decision*

In 1972, the Supreme Court came down with its decision in *Klopping, supra,* 8 Cal.3d 39. It held that a valid claim for inverse condemnation could be based on governmental actions *preceding* an actual, or even a de facto, taking of property. In *Klopping,* the City of Whittier adopted a resolution to initiate proceedings to condemn the plaintiffs' property[9] and initiated condemnation proceedings. Subsequently, one of the landowners whose property would be assessed in order to fund the acquisition brought suit to enjoin the assessment. While this legal challenge was pending, the city lacked the funds to acquire the plaintiffs' property, so dismissed the pending eminent domain proceeding. However, the city declared its "firm intention to reinstitute proceedings when and if the [assessment suit] was terminated in the city's favor." (*Id.* at p. 42.) The plaintiffs sued in inverse condemnation, alleging that the fair market value of their properties had declined as a result of the city's announcement of its intention to condemn, and ultimate dismissal of the condemnation proceedings while simultaneously stating that it would resume the condemnation proceedings in the future. (*Id.* at p. 43.) The plaintiffs argued that this conduct placed a cloud of uncertainty over their property, and that they had lost rentals as a result of the city's conduct. (*Id.* at pp. 45–46.)

The *Klopping* court recognized that, as a general matter, when considering the fair market value of a property taken in eminent domain, it is necessary to disregard the effect of the steps taken by the condemning authority toward the acquisition.[10] "However," the court stated, "we are also

---

[9] *Klopping* predated the statutory requirement of a specific "resolution of necessity."

[10] When a public entity makes known its intent to acquire property for public use, this statement alone could make the property value increase or decrease, depending on numerous factors. But, just as the public entity should not be required to pay an additional premium for a

aware that to allow recovery under all circumstances for decreases in the market value caused by precondemnation announcements might deter public agencies from announcing sufficiently in advance their intention to condemn. The salutary by-products of such publicity have been recognized by this court [citation]; plaintiffs likewise agree that a reasonable interval of time between an announcement of intent and the issuance of the summons serves the public interest. Therefore, in order to insure meaningful public input into condemnation decisions, it may be necessary for the condemnee to bear slight incidental loss. However, when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property so as to measure the fair market value as of a date earlier than that set statutorily . . . . Under our conclusion . . . a public authority is not required to compensate a landowner for damages to his property occurring after the announcement if the injury is not unreasonably caused by the condemning agency; interest is likewise to run not from the announcement but from the valuation date. [Citations.] [¶] Accordingly we hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Klopping, supra*, 8 Cal.3d at pp. 51–52, fn. omitted.)

In this case, plaintiffs argue that they have alleged a cause of action under either prong of the first element of the *Klopping* rule. That is to say, plaintiffs argue both that (1) the City unreasonably delayed filing an eminent domain action following an announcement of intent to condemn and (2) the City engaged in other unreasonable conduct. We consider each prong separately.

### 4. *Plaintiffs Cannot State a Cause of Action for Unreasonable Delay Following an Announcement of Intent to Condemn*

In *Klopping*, there was no doubt that the City of Whittier had announced its intent to condemn. The city had (1) adopted a resolution for the initiation of eminent domain proceedings; (2) actually commenced eminent domain proceedings; and (3) adopted a second resolution authorizing dismissal of the proceedings but declaring the city's firm intention to reinstitute proceedings

property simply because it is known to be necessary for a public project, the public entity should also not be allowed to benefit from a decline in market value following an announcement of condemnation which results in tenants leaving the property.

when and if the assessment suit was resolved in its favor. (*Klopping, supra*, 8 Cal.3d at p. 42.) In the instant case, however, the City defendants' conduct is not quite so clear. Indeed, the City did not commence eminent domain proceedings and adopted no resolution of necessity. Cases subsequent to *Klopping* have considered the issue of what conduct, shy of the adoption of a resolution of necessity, is sufficient to trigger a duty under *Klopping* to proceed expeditiously or be subject to a suit for damages. While there may be some dispute as to the precise minimum of conduct that will constitute an announcement of intent to condemn, it cannot reasonably be disputed that the City defendants' conduct in this case did not reach that point.[11]

■ The law has concluded that, in the absence of a resolution of necessity, a plaintiff must allege that the conduct of the public entity has resulted "in a special and direct interference with the owner's property." (*People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc.* (1979) 91 Cal.App.3d 332, 355 [153 Cal.Rptr. 895]; see also *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 530 [86 Cal.Rptr.2d 473] [recovery under *Klopping* "requires some 'direct' and 'special' interference with the landowner's use of the property"]; *Toso v. City of Santa Barbara* (1980) 101 Cal.App.3d 934, 956 [162 Cal.Rptr. 210] [in the absence of a resolution, the public entity's conduct must have evolved to the point where it results in "special and direct interference" with plaintiff's property].) Such "special and direct" interference is distinguished from the widespread effects suffered by all landowners in the area to be affected by the proposed plan. The landowner's property must be singled out for unique treatment in contrast to other landowners who could be affected by the proposed public work. (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1548–1549 [49 Cal.Rptr.3d 259].)

Putting it another way, the *Klopping* court explained that precondemnation announcements alone should not subject public entities to liablity, and that landowners must bear some incidental loss resulting from such general planning announcements. Thus, liability can attach only when the public entity's conduct has passed from the *planning* stage into the *acquiring* stage. (*Terminals Equipment Co. v. City and County of San Francisco* (1990) 221 Cal.App.3d 234, 246 [270 Cal.Rptr. 329]; *Cambria Spring Co. v. City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1098 [217 Cal.Rptr. 772].) Plans for public projects can change or be abandoned; *Klopping* was never intended to inhibit long-range planning or require that public entities acquire property for proposed public improvements before it may be needed. (*Johnson v. State of California* (1979) 90 Cal.App.3d 195, 198–199 [153 Cal.Rptr. 185].) Liability

---

[11] When "it is evident from the complaint that the facts do not justify recovery under *Klopping*, it is proper to decide the issue at the pleading stage." (*Barthelemy v. Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558, 572 [76 Cal.Rptr.2d 575] (*Barthelemy*).)

only attaches when the public entity has taken some action toward actually acquiring the property. (*Terminals Equipment Co. v. City and County of San Francisco, supra,* 221 Cal.App.3d at p. 246; *Toso v. City of Santa Barbara, supra,* 101 Cal.App.3d at p. 957.)

The great bulk of the conduct of the City defendants, on which plaintiffs seek to base their *Klopping* cause of action, constitutes general planning with no specific and direct interference with plaintiffs' property. The project in question covered 80 acres of land encompassing over 200 parcels. Signs announcing the project, general statements by the City and developer defendants that the project would go forward, and statements in a grant application indicating the City's willingness to proceed with the project were equally applicable to all 200 parcels, and simply constitute general planning, with no specific and direct interference with plaintiffs' particular property rights. (See *Cambria Spring Co. v. City of Pico Rivera, supra,* 171 Cal.App.3d at p. 1098 [a grant application for funding for the project lacks the specific and direct focus on an individual property necessary for *Klopping* liability]; *Toso v. City of Santa Barbara, supra,* 101 Cal.App.3d at p. 957 ["public meetings, negotiations, planning, debates and an advisory ballot proposition calling for acquisition [of the property]" all constitute mere general planning]; *Johnson v. State of California, supra,* 90 Cal.App.3d at p. 199 ["inevitable public knowledge" of the proposed project is not sufficient under *Klopping*].)

We therefore eliminate from our analysis any conduct which constitutes general planning as a matter of law. We are left with plaintiffs' allegations that (1) the City defendants caused plaintiffs' property and business to be appraised; (2) the City defendants requested plaintiff obtain his own appraisal so that negotiations could commence; and (3) the Mayor met with Joffe and told him that either Joffe would sell the property to the City defendants or they would take it using eminent domain. While these acts were presumably directed toward plaintiff and not necessarily directed toward other landowners implicated by the project, these acts fail to trigger liability under *Klopping* because none of these acts went beyond the planning stage into the acquisition stage.

■ Indeed, as discussed above, before a public entity can bring an eminent domain action, it must first adopt a resolution of necessity. Before a public entity can adopt a resolution of necessity, it must make an offer to purchase the property for an amount no less than its appraised fair market value. Thus, obtaining an appraisal of plaintiffs' land and business constituted a necessary preliminary step toward possibly acquiring the property. We are not prepared to hold that when a public entity obtains an appraisal of a property with an eye toward potential acquisition, the public entity's conduct has evolved from "planning" to "acquiring." (See *Cambria Spring Co. v. City*

*of Pico Rivera, supra*, 171 Cal.App.3d at p. 1098 [appraisals of property not "directed at an immediate taking" of the property do not amount to an act of acquisition].) In *People ex rel. Dept. Pub. Wks. v. Peninsula Enterprises, Inc., supra*, 91 Cal.App.3d at p. 356, we found it "most significant" that an offer had been made to purchase the property; in this case, it is most significant that no offer has been made.[12]

Similarly, the fact that the Mayor told Joffe that the property would be acquired by the City either by purchase or eminent domain is not an act of acquisition. In *Terminals Equipment Co. v. City and County of San Francisco, supra*, 221 Cal.App.3d at page 240, it was alleged that city and city redevelopment agency officials "have on 'numerous occasions . . . assured' [plaintiffs] that the Property would eventually be acquired by negotiation or through the power of eminent domain at some future date." These "informal representations" do not "set forth facts showing any official act by [the city] towards actually acquiring the property." (*Id.* at p. 246.)

Plaintiffs argue that they have established the necessary special and direct interference with their use of the property based on the unique nature of Plycraft's business. Specifically, plaintiffs argue that, because Plycraft requires orders many months in advance of production and delivery, the uncertainty over the City defendants' acquisition of the property caused Plycraft to inform its customers that it could not guarantee delivery, a situation that drove away the bulk of its business. But *Klopping* liability does not depend on specific and unique *harm*, but specific and direct *interference*. In other words, the focus is on defendants' conduct and whether it amounted to an interference with plaintiffs' right to use and enjoy their property.

■ Plaintiffs' argument in this regard is foreclosed by *Barthelemy, supra*, 65 Cal.App.4th 558. In *Barthelemy*, the plaintiffs owned a parcel of land which they used for dairy operations. The public entity adopted a flood control plan encompassing the property, designated the plaintiffs' property for future acquisition, and acquired adjacent properties. At this point, the plaintiffs chose to mitigate their losses by acquiring an alternative site for their business. They then sought damages for the cost of mitigation and relocation. The plaintiffs' complaint was dismissed on demurrer, and the Court of Appeal affirmed. The court explained, "Absent a formal resolution of condemnation, the public entity's conduct must have 'significantly invaded or appropriated

---

[12] Indeed, making an offer triggers a duty to provide the property owner with an informational pamphlet detailing the process of eminent domain and the property owner's rights. (Gov. Code, § 7267.2, subd. (a)(2).) Making an offer "under a threat of eminent domain" requires the public entity to offer the reasonable costs of an independent appraisal ordered by the owner. (Code Civ. Proc., § 1263.025, subd. (a).) Neither of these provisions was triggered in this case, as the conduct of the City defendants did not proceed to the point of making an actual offer for plaintiffs' property.

the use or enjoyment of' the property. [Citation.] Thus, decisions generally have required a showing that the public entity 'acted affirmatively to lower the value of the subject property, physically burdened the property, and/or decreased the income the property produced.' [Citation.] For this reason, mere designation of property for public acquisition, even though it may affect the marketability of the property, is not sufficient." (*Id.* at p. 565.) The court concluded that adopting a flood control plan, designating the plaintiffs' property for future acquisition, and acquiring adjacent properties is insufficient to trigger damages under *Klopping*, as the entity did nothing to interfere with the plaintiffs' use of their property. (*Id.* at p. 571.) The court explained, "Thus, any impairment of plaintiffs' dairy operations was the direct result of their own conduct in purchasing the [alternative] property, not the conduct of the District directed toward acquisition of the [existing] property. Consequently, the kind of *direct* interference required for a *Klopping* claim is lacking. Indeed, recognition of liability under these circumstances would invite a landowner to take whatever actions it deemed necessary to relocate its operations at public expense, without any assurance that the public entity would actually acquire the original property." (*Ibid.*)

Although *Barthelemy* involved plaintiffs who chose to expend substantial funds to relocate their business while the instant case involves plaintiffs who chose to inform their customers that schedules could not be met, the difference has no relevance. The City did nothing to interfere with plaintiffs' use of their property; that plaintiffs chose not to use it for their business was not caused by the City.

In sum, plaintiffs have alleged no conduct of the City defendants that, either alone or considered together, constitutes an announcement of an intent to condemn sufficient to justify damages for unreasonable delay in condemnation under *Klopping*. The bulk of defendants' conduct constituted general planning, and was not directly addressed to plaintiffs' property. The few instances of conduct specifically addressed to plaintiffs' property constituted planning as a matter of law, and did not rise to the level of demonstrating a present intent to acquire. Plaintiffs have therefore failed to allege a cause of action under the first prong of *Klopping*.

### 5. *Plaintiffs Cannot State a Cause of Action for Unreasonable Precondemnation Conduct*

Plaintiffs argue that, even if they have failed to state a cause of action for unreasonable precondemnation delay under *Klopping*, they can state a cause of action for other "unreasonable precondemnation conduct."

Preliminarily, the law is unclear as to whether *Klopping* requires an announcement of intent to condemn if liability is based on unreasonable conduct other than postannouncement delay. (*Border Business Park, Inc. v. City of San Diego, supra*, 142 Cal.App.4th at p. 1548.) Even if no such announcement is required, however, plaintiffs cannot pursue a cause of action for unreasonable precondemnation conduct for the simple reason that they have alleged no such conduct.

In the operative complaint, plaintiffs simply set forth eight paragraphs of the City defendants' alleged conduct, encompassing the announcement of the project, the appraisals, the City's representations that the project would go forward and plaintiffs' property would be acquired, and the fact that the project has not, in fact, gone ahead. Plaintiffs then allege that this conduct "constituted unreasonable delay and unreasonable conduct within the meaning of" *Klopping*. In their opening brief on appeal, plaintiffs simply argue that, as to the latter theory of relief, their allegation "of ultimate fact should be sufficient to raise the issue and give notice" of a cause of action. The City defendants argued in their respondents' brief that the allegations of the complaint are insufficient to state a cause of action on this theory. In response, in plaintiffs' reply brief, they argue for the first time that the "real gist" of their claim is not delay, but that the City defendants acted unreasonably.

In their reply brief, plaintiffs suggest that "their claim is comprised of everything the City did to intimidate [them] with threats of condemnation, coupled with activities that were consistent with carrying out those threats, as well as the long-drawn-out failure to ever actually do so. [Plaintiffs] were grievously harmed by reason of this oppressive conduct which, on its face, was patently 'unreasonable.' "

Apart from the "long-drawn-out failure to ever actually [condemn the property]," which is a clear allegation of precondemnation delay, plaintiffs categorize as unreasonable the City's "threats of condemnation" and "activities consistent" with condemnation. Yet, when the specific allegations of the complaint are considered, these "threats" and "activities consistent" are simply acts of planning for the project which, ultimately, never came to fruition. Plaintiffs allege only that the City defendants announced a project, sought a grant to fund the project, obtained an appraisal preliminary to making an offer for a parcel for the project, and informally told a landowner that the property would be acquired for the project. None of these acts can possibly constitute unreasonable conduct—at least, not in the absence of additional allegations.

Although plaintiffs categorize the City defendants' conduct as "intimidat[ion]" and "extortion," there are no allegations to support these categorizations. There is no allegation, for example, that the City defendants intentionally acted as they did "for the purpose of depressing the fair market value and preventing plaintiffs from using their land."[13] (*Klopping, supra*, 8 Cal.3d at p. 54; see also *Toso v. City of Santa Barbara, supra*, 101 Cal.App.3d at pp. 954–955.) There is no allegation that, when the Mayor informed Joffe that his property would be acquired one way or the other, the Mayor knew the property would not be acquired. There is no allegation that, when the Mayor told Joffe that ground would be broken within six months, the Mayor had reason to believe that this was untrue. There is no allegation that, when the Mayor told Joffe that the property would be acquired, there was any intent to intimidate Joffe into selling his property at a below-market value.[14] Moreover, there is no allegation that Joffe and Plycraft informed the City defendants of the unique nature of their business, and that the business would be harmed in the absence of knowing the specific date of condemnation. Without any such allegations, which could conceivably render the City's conduct unreasonable, plaintiffs have alleged only that the City defendants performed some planning activity on a project that was never built. This cannot constitute unreasonable conduct as a matter of law.

6. *Plaintiffs Have Not Alleged Claims in Either Equitable Estoppel or Promissory Estoppel*

Plaintiffs argue that the statements and representations made by the Mayor and other representatives of the City defendants caused them to rely to their detriment on the "threatened" condemnation. Plaintiffs claim that they were unable to make long-term contractual commitments to furniture customers and thus lost their business at the property. In addition, efforts to lease the property after the business failed were unsuccessful because they could not assure potential lessees of any particular term that would not be interrupted by the threatened condemnation.

■ Unfortunately for plaintiffs' argument, their allegations do not state a claim based on either equitable[15] or promissory estoppel. A claim of

---

[13] In the conclusion section of their opening brief, plaintiffs state, "it is not beyond the moral limits of some public entities to announce condemnation plans but delay action for ulterior purposes, such as to artificially drive down the market value of properties to be acquired." We do not disagree with this general statement. However, plaintiffs did not plead such an improper purpose in their operative complaint, nor otherwise suggest that they could.

[14] Indeed, as no offer was ever made for the property, it is difficult to see how the Mayor could possibly have intended to intimidate Joffe into selling.

[15] The equitable estoppel doctrine acts defensively only. Thus, there is no stand-alone cause of action for equitable estoppel as a matter of law. (*Behnke v. State Farm General Ins. Co.*

equitable estoppel consists of the following elements: (1) a representation or concealment of material facts; (2) made with knowledge, actual or virtual, of the facts; (3) to a party ignorant, actually and permissibly, of the truth; (4) with the intention, actual or virtual, that the ignorant party act on it; and (5) that party was induced to act on it. (*Behnke v. State Farm General Ins. Co., supra*, 196 Cal.App.4th at p. 1462.) Plaintiffs have not alleged a claim of equitable estoppel because they have failed to allege a representation or concealment of material facts with knowledge of the actual facts. Plaintiffs have alleged only that the Mayor and other City defendants told them that their property would be acquired by the City for the project; plaintiffs have never represented to any court that they could allege that the Mayor and City defendants knew that the property would not be acquired when they made these representations.

■■■ Similarly, plaintiffs cannot state a claim for promissory estoppel. " 'Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." [Citation.]' [Citation.] Because promissory estoppel is an equitable doctrine to allow enforcement of a promise that would otherwise be unenforceable, courts are given wide discretion in its application. [Citations.]" (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 901–902 [28 Cal.Rptr.3d 894].) "The elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' [Citation.]" (*Id.* at p. 901.) Plaintiffs have not alleged facts supporting reasonable reliance. This is true because informal representations of a City official regarding planned acquisition in the future are simply not far enough along in the acquisition process for reliance on the statements to be reasonable. At the time of the Mayor's statement, there were still several opportunities for the project, and the acquisition of plaintiffs' property, to become derailed. Specifically, (1) the interested retail tenants could back out of the project; (2) anticipated funding sources could become unavailable; and (3) the City could fail to adopt a resolution of necessity. The fact that the City's plans had not even solidified to the point of making an offer to plaintiffs for the property[16] forecloses the possibility that plaintiffs acted reasonably in relying on the Mayor's statements of future acquisition. There is no promissory estoppel as a matter of law.

---

(2011) 196 Cal.App.4th 1443, 1463 [127 Cal.Rptr.3d 372].) Plaintiffs argued before the trial court that the City should be equitably estopped to deny that it communicated an intent to condemn their property.

[16] The statutorily required offer may be conditioned on the subsequent adoption of a resolution of necessity. (Gov. Code, § 7267.2, subd. (a)(1).)

## *DISPOSITION*

The judgment is affirmed. The City defendants shall recover their costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

On December 2, 2011, the opinion was modified to read as printed above.