Filed 12/23/21  Los Medanos Community etc. v. Contra Costa Local etc. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LOS MEDANOS COMMUNITY HEALTH DISTRICT, | A160146 |
| Plaintiff and Respondent, | |
| v. | (Contra Costa County Super. Ct. No. MSC19-00048) |
| CONTRA COSTA LOCAL AGENCY FORMATION COMMISSION, | |
| Defendant and Appellant; | |
| COUNTY OF CONTRA COSTA, | |
| Real Party in Interest and Appellant. | |

The Los Medanos Community Health District (District) filed the underlying mandamus petition seeking to compel the Contra Costa Local Agency Formation Commission (LAFCO) to hold an election over whether the District should be dissolved instead of ordering the dissolution without an election.  The District argues LAFCO represented that a certain number of protest signatures would trigger an election and is equitably estopped from requiring a greater number.  We disagree and reverse the trial court's order granting the District's petition and issuing a writ of mandate.

1

## LEGAL BACKGROUND

"A local agency formation commission is an administrative body created pursuant to the Cortese–Knox–Hertzberg Local Government Reorganization Act of 2000 (Gov. Code, § 56000 et seq.) (the Act) to 'control the process of municipality expansion.  The purposes of the act are to encourage "planned, well-ordered, efficient urban development patterns with appropriate consideration of preserving open-space [and agricultural] lands within those patterns" [citation], and to discourage urban sprawl and encourage "the orderly formation and development of local agencies based upon local conditions and circumstances." ' "  (*Citizens for Responsible Open Space v. San Mateo County Local Agency Formation Com.* (2008) 159 Cal.App.4th 717, 721 (*Citizens*).)

Among other powers, local agency formation commissions consider proposals for organizational changes to local agencies, including dissolution. (Gov. Code, §§ 56021, subd. (h), 56375, subd. (a)(1).)[1]  An affected local agency can initiate the dissolution of another local agency by submitting an application.  (§ 56654, subd. (a).)  If the commission approves the application, it notices a protest hearing on the proposed dissolution.  (§§ 57000, subd. (a), 57002, subd. (a), 57025.)  Any registered voter within the relevant territory who objects to the dissolution may submit a written protest between the notice and the hearing.[2]  (§ 57051.)

After the protest hearing, the commission's executive officer "shall cause the names of the signers on the [protest] petition to be compared with the voters' register in the office of the county clerk or registrar of voters" and

---

[1] All undesignated section references are to the Government Code.

[2] Provisions involving protests by landowners are not relevant here. (See § 57051.)

must ascertain "[t]he number of registered voters in the affected territory" and "[t]he number of qualified signers appearing upon the petition." (§ 56707; see § 57052.) If at least 25 percent of the registered voters in the affected territory submitted written protests to the commission, the commission shall order the dissolution subject to confirmation by the voters. (§ 57077.1, subd. (b)(2)(A)(ii).) If protests were submitted by less than 25 percent of the registered voters, the dissolution proceeds without an election. (§ 57077.1, subd. (a).)

The governing statute "does not indicate the date on which the number of registered voters should be counted for the purpose of determining whether an election is required . . . . As no . . . provision expressly governs this issue, the matter remains vested in [the commission's] discretion." (*Citizens, supra,* 159 Cal.App.4th at p. 730, fn. omitted.)[3] In *Citizens,* the Court of Appeal concluded a local agency formation commission did not abuse its discretion by using the number of registered voters as of the date of the protest hearing. (*Id.* at pp. 730–731.) The court found the commission's explanation for using this date was reasonable: The 25 percent threshold " 'represent[s] [a] fraction[]—the number of valid protests over the total number of registered voters. It requires only simple logic to conclude that the denominator and numerator of the fraction should be measured at the same time.' Residents who register to vote after the application is certified are eligible to submit protests and, thus, they should also be included in the final count of registered voters for purposes of section 57052. Likewise, voters who move

---

[3] The statute at issue in *Citizens* was section 57075, governing protest hearings for proposals to annex or detach a special district. No party argues that the relevant provisions of section 57075 are materially different from those of section 57077.1, governing dissolution protest hearings.

from the affected area prior to the end of the protest period should be excluded from the final count." (*Id.* at p. 731.) The court also held the decision was "consistent with section 56707 which . . . required [the commission's] executive officer to ascertain, at the time the protests were being verified, both the number of registered voters in the affected territory and the number of qualified signers who submitted protests." (*Ibid.*)[4]

FACTUAL AND PROCEDURAL BACKGROUND

The District has been a local healthcare district within Contra Costa County (County) since 1948. In 2018, the County filed an amended application with LAFCO to dissolve the District.[5] In September 2018, LAFCO approved the application and voted to dissolve the District.[6] On October 2, LAFCO noticed a public hearing on the dissolution for November 30.

On September 27, 2018, a LAFCO executive assistant emailed the District certain information related to the upcoming protest period, and included the following: "There are just under 42,000 voters in the district. By law, you would need to collect valid signatures of approximately 10,500 voters."

On November 1, 2018, the District signed a contract with a petition gathering company to gather signatures protesting the dissolution. The contract provided that the company would try to get "a total of 18,000

---

[4] Section 56707 applies to all protests over changes of organization, including dissolution. (§ 57052.)

[5] The background of and reasons for the application are not relevant to this appeal.

[6] LAFCO denied the District's request for reconsideration of this decision.

4

signatures, with 12,500 being valid registered voters." The president of the company submitted a declaration in the trial court stating, "at the time the agreement was signed," the District's newly-appointed executive director Itika Greene "was unsure as to the exact number of signatures required. . . . Shortly after the agreement was signed, Ms. Greene informed me that I was to obtain a minimum of 10,500 protest signatures."

On November 26, 2018, Greene spoke on the telephone to Lou Ann Texeira, LAFCO's executive officer. In a declaration submitted to the trial court, Greene averred that she spoke to Texeira "to ensure that the consultant that the District hired to collect protest signatures had the latest list of registered voters for the District" and "to confirm the number of registered voters LAFCO would use to determine the twenty-five percent of protest signatures required" to trigger an election.[7] Greene further averred that her "recollection is that Ms. Texeira informed me that the number of registered voters that LAFCO would use to determine the twenty-five percent needed was approximately 42,000, so the protests needed would be approximately 10,500. Texeira submitted a declaration averring she "had learned at some point that as of August 2018, the District had approximately 42,000 voters" and passed that information on to Greene, but also "encouraged the District to separately contact the County Elections Office for additional information as County Elections, not LAFCO, has the most recent and updated voter registration figures."

At 4:30 p.m. on November 26, 2018, Greene emailed Texeira the following: "As you suggested, I contacted the CCC Elections office. I spoke

---

[7] Greene's decision to "confirm" this number suggests the District was not prepared to rely on the executive assistant's representation in the September 2018 email.

with two people. I was told that LAFCO has a different situation and that the number of registered voters to be used is the number of registered voters who voted in the **2014** general election. I was also told that LAFCO should have the correct number for us to use and not the County Elections office. I do have another call in to a 3rd person, however, I wanted to give you an update on my most recent response. [¶] Do you have the number of registered voters from the 2014 general election?"

At 5:09 p.m. on November 26, 2018, an employee of the County's Election Division (County Elections) emailed a LAFCO employee the following: "I spoke with Jackie. She told [Greene] . . . that 2014 counts are not in the mix. This is a LAFCO matter/election. All our office is doing is checking signatures at this point. We are not even looking at [it] from an election standpoint. Lafco is the administrator on this." The LAFCO employee responded, in relevant part, "we will just be going with the current registered voter count, correct?" The County Elections employee responded, "Yes, current voter count."

The following morning, on November 27, 2018, Texeira responded to Greene's email asking for the 2014 voter roll as follows: "Our understanding is that County Elections will verify voters and signatures using the current voter roll." The District's outside counsel was copied on this email exchange.

On November 28, the petition gathering company informed the District that it had obtained more than 10,500 valid signatures.[8] The company then stopped gathering signatures, even though there were two more days before the close of the protest period, pursuant to the company's standard practice to

---

[8] The company's president averred that his staff "carefully checked each of the protest signatures we obtained against our customized database to determine whether each was valid or invalid."

end campaigns after gathering the required number of signatures to avoid the unnecessary expense of gathering excess signatures.

At the November 30, 2018 protest hearing, the District submitted more than 16,000 protest signatures. LAFCO turned the protest signatures over to County Elections to verify them. On December 3, 2018, Texeira wrote County Elections staff to "confirm that the County is using the registered voter number as of the date of the protest hearing (11/30) rather than an earlier date." On December 11, in response to an inquiry by a County Elections employee, Texeira again stated, "Regarding the registration number, we would use the number of registered voters in the District as of 11/30/18 – protest hearing date."

At a December 12, 2018 LAFCO meeting, LAFCO staff provided an update on the District protest. One of the commissioners asked Texeira for "a ballpark idea of what constitutes 25 percent," and she responded, "There are approximately 42,000 registered voters in the District, so approximately 10,500 valid signatures."

Between December 26, 2018, and January 4, 2019, Texeira exchanged emails with the County's assistant registrar about the protest signature count. The assistant registrar asked, "What is your calculation of the number of signatures required," and "What do you consider to be the magic number? This is a number that you guys determine. [¶] The reason for me asking is there may be a chance that they won't have enough VALID signatures." Texeira replied, "What was the total number of registered voters in the District as of November 30? The magic number would be 25% of that number." In a subsequent email in the same chain, Texeira stated, "LAFCO staff doesn't have the number of registered voters as of November 30th – we would defer to County Elections for that number." On January 3, 2019, a

County Elections employee emailed Texeira "the registered voter report for the district" indicating there were 44,049 registered voters. The following day, Texeira passed this information along to the District.

On January 8, 2019, County Elections informed LAFCO that 10,594 valid signatures had been submitted. On January 9, 2019, Texeira reported the results of the protest to LAFCO. The report stated that, given the 44,049 registered voters on November 30, 2018, a minimum of 11,013 valid protests were needed to trigger an election on the dissolution. Because only 10,594 valid protests had been received, the threshold to trigger an election had not been met. In the trial court, the president of the District's petition gathering company averred that he was "absolutely confident" he could have obtained 11,013 signatures before the close of the protest period, had he known at the outset that was the required number.

At the January 9, 2019 LAFCO meeting, the District's counsel asked LAFCO not to proceed with the dissolution because LAFCO staff had informed the District only 10,500 signatures would be required. LAFCO's counsel responded to the argument as follows: "the number of registered voters at any given time is in flux. People register to vote on a daily basis. They also move away from their respective homes and no longer -- they reregister someplace else, and so it's constantly changing. And in particular what happened over the course of this election cycle, because this protest hearing happened to fall within an election year, it generated higher turnout in registration than normal, we did see more people register to vote from the beginning of the protest period until the end. [¶] And so the number that LAFCO staff provided to the District was an approximate number of both registered voters and 25 percent. So Commission staff had an approximate number at the time of approximately 42,000 registered voters, and one

8

quarter of that is 10,500. Those are not exact numbers, and so that -- that is fundamentally the issue, is that there are more voters at the end of the process than were anticipa- -- than were believed to be registered at the beginning of the protest proceeding." LAFCO voted to order the District dissolved.

In January 2019, the District filed the underlying action for writ of mandate (Code Civ. Proc., § 1085).[9] The trial court granted a preliminary injunction prohibiting LAFCO from proceeding with the dissolution during the pendency of the action. The administrative record was lodged with the trial court and the parties submitted declarations.[10] Following a hearing, the trial court found LAFCO equitably estopped from requiring more than 10,500 protest signatures to trigger an election and issued a writ of mandate. LAFCO and real party in interest the County appealed.

DISCUSSION

I. *Standard of Review*

Appellants and the District dispute whether we review LAFCO's action pursuant to section 56107 or traditional mandamus principles. (Compare § 56107, subd. (c) ["In any action or proceeding to attack, review, set aside, void, or annul a determination by a commission on grounds of noncompliance with this division, any inquiry shall extend only to whether there was fraud or a prejudicial abuse of discretion."], with *Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 611 ["The trial court reviews an

---

[9] Although the District alleged additional causes of action, most were subsequently dismissed and none are at issue in this appeal.

[10] No party objects to the admission of the declarations in this mandamus proceeding. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, 578 [discussing admissibility of extra-record evidence in traditional mandamus actions].)

9

administrative action pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires."].)

However, the underlying propriety of LAFCO's action is not at issue; instead, the only question is whether LAFCO was equitably estopped from taking such action. Therefore, our review is limited to the trial court's determination that equitable estoppel applies. (See *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1351–1352, 1360 (*Feduniak*) [applying equitable estoppel standard of review in administrative mandamus action where only issue was whether agency was estopped from taking otherwise valid action].) "[W]here the facts are undisputed, whether equitable estoppel applies is a question of law." (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 240 (*City of Oakland*).) No party contends the facts are in dispute. Therefore, we review de novo the issue whether equitable estoppel applies to prohibit LAFCO from requiring more than 10,500 signatures to trigger an election on the District's dissolution.

II.    *Equitable Estoppel*

"The doctrine of equitable estoppel is founded on notions of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that person has intentionally led others to believe a particular circumstance to be true and to rely upon such belief to their detriment." (*City of Oakland, supra,* 224 Cal.App.4th at p. 239.) "The elements of equitable estoppel are '(1) the party to be estopped must be apprised of the facts; (2) [the party to be estopped] must intend that [that party's] conduct shall be

10

acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) [the other party] must rely upon the conduct to [that party's] injury. [Citation.]' [Citation.] The detrimental reliance must be reasonable." (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.) "Where, as here, a party seeks to invoke the doctrine of equitable estoppel against a governmental entity, an additional element applies. That is, the government may not be bound by an equitable estoppel in the same manner as a private party unless, 'in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel.' " (*City of Oakland,* at p. 240.)

The parties dispute the first element, whether LAFCO was apprised of the facts. LAFCO informed the District there were approximately 42,000 registered voters. Texeira averred this information was based on figures from August 2018—one month before the September email and three months before the November telephone call.[11] LAFCO could not have obtained the

___

[11] The District points to three representations made by LAFCO: the September email from the LAFCO staff member, Greene's November 27 telephone call with Texeira, and Texeira's statement at the December 12 LAFCO hearing. The last, as the District concedes, took place after the protest period ended and therefore could not have impacted the District's signature gathering. The District's suggestion that Texeira's December statement is evidence that LAFCO "intentionally changed" the date after learning the number of valid protests "for the sole purpose of manipulating the outcome" is unavailing: as detailed in the factual background above, before learning of the number of valid protests, Texeira repeatedly told County Elections the relevant date was November 30, 2018. There is thus no evidence that LAFCO "act[ed] in bad faith," one of the factors that may impact the estoppel analysis. (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 307 (*Driscoll*).)

November 30, 2018 voter registration figures until November 30, after both of these representations were made. Nor is there any evidence that LAFCO obtained updated information from County Elections before either of the representations; to the contrary, email exchanges between LAFCO and County Elections contained in the administrative record demonstrate LAFCO did not have the November 30 voter registration figure until January 2019. The District does not contend LAFCO should have known the voter figures were likely to increase significantly between August and November, and no evidence so suggests. (*Feduniak, supra,* 148 Cal.App.4th at p. 1361 ["knowledge of the pertinent facts may be imputed where the circumstances show that one ought to have known them"].) Accordingly, LAFCO was not apprised of the voter registration figures for November 30, 2018 at the time of the representations. (See *Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492, 513 ["Plaintiffs have alleged only that the Mayor and other City defendants told them that their property would be acquired by the City for the project; plaintiffs have never represented to any court that they could allege that the Mayor and City defendants knew that the property would not be acquired when they made these representations."].)

The District suggests that the relevant fact is not the number of registered voters, but rather the date LAFCO chose for determining the number of registered voters. The District argues LAFCO's reference to "approximately 42,000 voters" implied it would use a date in August 2018 when it in fact knew it would use November 30. Assuming this is how the District actually understood LAFCO's representations, we turn to the fourth

12

element of equitable estoppel and consider whether the District's detrimental reliance on such an understanding was reasonable.[12]

Two cases are instructive. *Board of Supervisors v. Superior Court* (1983) 147 Cal.App.3d 206 (*Board of Supervisors*) involved a referendum petition protesting a county zoning ordinance. (*Id.* at p. 209.) The governing statute required the petition obtain signatures equivalent to ten percent of the number of votes cast " '*within the county*' " at the last gubernatorial election. (*Id.* at p. 211.) County counsel informed petition supporters that they only needed signatures of "ten percent of the voters of 'the unincorporated area of the county' " and prepared language used in the petition stating, " 'All Signers of this Petition must be registered voters in an unincorporated area of [the county]. . . .' " (*Id.* at pp. 209–210.) However, the registrar of voters told petition supporters he understood the ten percent requirement to apply to "the total vote of the county in the last gubernatorial election." (*Ibid.*) The registrar directed counsel for the petition supporters to the text of the statute and told him county counsel in another county had reached a different conclusion from the present county counsel about whether the ten percent requirement applied to countywide votes or only votes in the

---

[12] To the extent appellants argue an employee's representations can never be the basis of estoppel against a public agency, we disagree. The appropriate analysis is whether reliance on a particular representation was reasonable. (E.g., *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 257–258 ["[n]othing in the [county] employee's representation" that the county "would not 'hassle' the Club over its violations" of land use and zoning laws "reasonably could lead the Club to believe the County never would enforce its land use requirements"]; *County of Sonoma v. Rex* (1991) 231 Cal.App.3d 1289, 1294, 1296 [inn owner's reliance on "statements of the unnamed planning department employee that no permit was required for a bed and breakfast inn" was "simply unreasonable"].)

unincorporated area. (*Id.* at p. 210.) The supporters submitted a petition with signatures equal to more than ten percent of the unincorporated votes, but less than ten percent of votes in the entire county, and the registrar found the petition insufficient. (*Id.* at pp. 209–210.) The trial court found estoppel excused the petition supporters' failure to submit the necessary number of signatures. (*Id.* at p. 212.) The Court of Appeal reversed: "We conclude, . . . as a matter of law, that real parties were not entitled to rely upon the legal opinion of county counsel under the circumstances of this case. . . . [¶] We acknowledge that various appellate opinions have approved estoppel against a public agency where a government official provided a legal opinion to a citizen. However . . . 'if the claimant is one who purports to have no knowledge or training which would aid [the claimant] in determining [the claimant's] rights and the public agency purports to be informed and knowledgeable in these matters' [citation], the conditions for an estoppel may exist. However, by negative inference, if the inquiring party has legal training or is represented by an attorney and the public agency not only does not purport to be knowledgeable, but even advises the inquiring party that the law is uncertain, an estoppel should not lie." (*Id.* at p. 213.)[13]

In contrast, in *City of Oakland,* the issue was whether a city and a retirement board were estopped from requiring certain city retirees to repay

---

[13] As the District notes, *Board of Supervisors* also reasoned that applying estoppel would "permit county counsel's erroneous interpretation to override state law referendum requirements." (*Board of Supervisors, supra,* 147 Cal.App.3d at p. 214.) Contrary to the District's suggestion, this was not the sole basis for the court's decision. (*Id.* at p. 216 ["Our role in this case is to insure the correct application of [the governing statute] *and to prevent an unwarranted extension of the estoppel doctrine to a case where the party asserting the theory had no basis for relying upon the advice given by the public agency.*" (italics added)].)

retirement benefits based on a specific type of income. (*City of Oakland, supra,* 224 Cal.App.4th at p. 239.) "[F]or almost a decade, the City actively asserted that [this type of income] should be treated as [pensionable], and the Board had knowledge of, and acquiesced in, the City's characterization." (*Id.* at p. 240.) In a significant difference from *Board of Supervisors*, "the retirees were unaware that the City's advice was erroneous and were likely not in a position to uncover the error." (*City of Oakland,* at pp. 241–242.) The Court of Appeal concluded that "the City and the Board are estopped from requiring [these] retirees to repay any retirement benefits based on the improper inclusion of" this type of income as pensionable. (*Id.* at p. 246.)

There is no record evidence that LAFCO made any express representations about the date on which voter registration figures would be based. In the November phone call, Texeira stated 42,000 was an "approximate[]" figure and suggested the District contact County Elections to get updated voter registration information. The following day, Texeira informed the District of LAFCO's intent to use "current" voter rolls.[14] Significantly, the District was a local agency represented by outside counsel—a far cry from unrepresented individuals relying on information received from government employees. The District was, or should have been, aware of the *Citizens* case holding LAFCO had the discretion to select the date on which to calculate voter registration figures and expressly approving the selection of the protest hearing as such a date. Under these

---

[14] The District argues it reasonably understood "current" to mean the August 2018 voter registration figures, in contrast to the 2014 voter figures referenced earlier in the email chain. But, as detailed in the factual background above, other correspondence in the administrative record indicates the District had already been informed by County Elections that the 2014 numbers were not at issue.

15

circumstances, it was not reasonable for the District to rely on LAFCO's equivocal approximations of the current voter registration figures.[15] (*City of Oakland, supra,* 224 Cal.App.4th at pp. 241–242; *Board of Supervisors, supra,* 147 Cal.App.3d at p. 213.) Accordingly, the District has failed to establish the required elements of equitable estoppel.[16]

DISPOSITION

The judgment is reversed.

_____

SIMONS, Acting P. J.

We concur.

_____
NEEDHAM, J.

_____
BURNS, J.

(A160146)

_____

[15] We note that "the protest process under the Act does not implicate a fundamental right to vote." (*Citizens, supra,* 159 Cal.App.4th at p. 725; see *Driscoll, supra,* 67 Cal.2d at p. 308 ["[o]f particular significance [in estoppel analysis] is the nature of the right asserted by the [party asserting estoppel]"].)

[16] Because of this conclusion, we need not decide appellants' alternative argument that the trial court's writ improperly directed the exercise of a discretionary decision.