Filed 11/20/15  HPT IHG-2 Properties Trust v. City of Anaheim CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| HPT IHG-2 PROPERTIES TRUST et al., | |
| Plaintiffs and Respondents, | G049695 |
| v. | (Super. Ct. No. 30-2012-00608509) |
| CITY OF ANAHEIM et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Steven L. Perk, Judge.  Request for Judicial Notice.  Request granted.  Motion to Strike Portions of Reply Brief.  Motion denied.  Judgment affirmed.

Rutan & Tucker, David B. Cosgrove and Peter J. Howell for Defendants and Appellants.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Michael H. Leifer, Michael I. Kehoe and Erin B. Naderi for Plaintiffs and Respondents.

\*          \*          \*

In 1999 defendant City of Anaheim (with defendant City Council of the City of Anaheim, collectively defendants) issued a conditional use permit (CUP 4153) permitting development of two hotels (Project) by plaintiff IHG MANAGEMENT MARYLAND (IHG) on property (Property) owned by plaintiff HPT IHG-2 PROPERTIES TRUST (HPT; plaintiffs).[1] At the time defendants issued CUP 4153, it had a plan to construct the Gene Autry Way Overpass (Overpass) on the south side of the Property. Construction would require taking a portion of the Property and eliminating a substantial number of plaintiffs' required parking spaces. To build the Overpass according to its plan, defendants would also be required to acquire adjoining property, with a triangular remnant (Triangle) remaining after construction.

The approval of CUP 4153 set out the number of parking spaces required for the Project before and after construction of the Overpass. CUP 4153 was based, in part, on a parking study (Parking Study) approved by defendants that showed the Triangle built with a two-level parking structure (Parking Structure). The resolution approving CUP 4153 also set out other development requirements, including upgraded setbacks and landscape. According to plaintiffs, defendants agreed they would build the Parking Structure and comply with the same upgraded setbacks and landscape requirements.

After defendants built the Overpass, they enacted a second CUP (CUP 5573) that allowed construction of a surface parking lot instead of the Parking Structure and which permitted setbacks and landscaping that did not conform to the upgraded setbacks and landscape required for the Project.

---

[1] Although IHG and HPT have different roles with respect to the Property, for purposes of this opinion there is no need to differentiate between them. Further, R.D. Olson Development (Olson) HPT's predecessor in interest, assisted IHG with development of the Property. Based on that relationship and Olson's participation in development of the Property, where relevant we include it in the collective designation of plaintiffs.

2

Plaintiffs filed a petition for writ of mandate asking the court to set aside CUP 5573.  The trial court found defendants were estopped to change the design approved in CUP 4153, granted the petition, and ordered CUP 5573 to be set aside.

Defendants raise several arguments why this was error.  They assert plaintiffs had no vested right in the Triangle because CUP 4153 did not apply to that property.  Further, they contend, CUP 4153 did not and could not require defendants to build and transfer the Parking Structure to plaintiffs.  They also maintain plaintiffs did not prove the elements of equitable estoppel.

Finding no error, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

*1. The Negotiations and Issuance of CUP 4153 and CUP 5573*

The Property is located near Disneyland in the City of Anaheim in the Resort Specific Plan Area (Resort Area).  In early 1999 Olson began the process of obtaining entitlements to construct the Project.  Defendants' planned Overpass was a substantial impediment to development of the Property.  Although defendants were not ready to construct the Overpass, they wanted plaintiffs to proceed with the Project.  One of plaintiffs' internal e-mails noted defendants "want[] the [P]roject, and they want it NOW!"  The Project was expected to stimulate additional development in the Resort Area.

Plaintiffs were not willing to develop the Property without assurances the Project would be viable after the Overpass was constructed.  When defendants ultimately took part of the Property for the Overpass, plaintiffs would lose a good deal of their parking, what turned out to be 142 of the 350-plus spaces required for the Project.  Plaintiffs needed to insure they could meet defendants' parking requirements for the Project after the Overpass was constructed.  Thus, the parties had to plan for development of the Project both before and after the Overpass was built.  Plaintiffs and defendants'

3

mayor, city council members, city manager, planning staff, and certain department heads negotiated throughout most of 1999 to reach an agreement as to the Project.

At some point, defendants proposed that plaintiffs could make up their deficit parking on the Triangle. In an internal e-mail plaintiffs noted defendants had advised that after they took plaintiffs' land to construct the Overpass, if the Triangle did "not fully park the site, they will fund and/or construct a parking garage to be built on the adjacent site to handle the parking balance."

A memo from the architects to various subcontractors on the Project stated defendants had agreed that when the Overpass was constructed, defendants would pay plaintiffs for the land it took from them and "construct a parking structure on an adjacent parcel to replace the surface parking spaces."

The day after that memo, defendants' city manager, Thomas J. Wood, sent a letter to plaintiffs (Wood Letter) to "clarify discussions that have transpired over the use of the future alignment of [the Overpass] . . . and to set[]forth our understanding of how [defendants] and [plaintiffs] will work together to ensure the success of the [Project]." Wood stated that, assuming defendants could acquire the adjoining property, defendants would convey it to plaintiffs.

A few days later in an internal e-mail plaintiffs noted that "[i]f a parking garage is needed, it will be a city expense built on the adjacent property." "We do not have to pay for a parking garage."

In order to accommodate construction of the Overpass, and to meet defendants' Resort Development Standards for strict setbacks, upgraded dense landscaping, parking, and the like, the Project had to be redesigned several times to show the site both before construction of the Overpass (what defendants called the "interim condition") and after construction of the Overpass (what defendants called the "ultimate condition"). Defendants required a site plan for both of these conditions. One of the

4

design modifications required moving the location of one of the hotel buildings, and resulted in fewer rooms being built.

Plaintiffs submitted a conceptual ultimate site plan that included a parking structure on the Triangle. Defendants approved this plan.

Plaintiffs also submitted an ultimate site plan (Ultimate Site Plan), to show the parking spaces met defendants' minimum dimensions and that the exact location of the Overpass was correctly shown on the plan. The Ultimate Site Plan demonstrated how it complied with the Resort Development Standards. It showed the location of buildings, setbacks, landscaping, and parking, including the Parking Structure on the Triangle after construction of the Overpass. Defendants approved the Ultimate Site Plan.

Plaintiffs' Parking Study incorporated the Ultimate Site Plan. The Parking Study stated that, after the Overpass was built, there would be 300 "surface stalls" and 55 stalls in a "below-grade parking structure." This was "intended to meet the needs of the two hotels when [the Overpass] is constructed." The Parking Study included a site plan showing the Triangle. It contained a diagram with hash marks showing parking stalls and under which was the caption, "Parking Structure" (capitalization omitted). In its report to the planning commission, defendants' staff approved the Parking Study

The resolution approving CUP 4153 (Resolution) was passed unanimously in December 1999. It approved both the interim and ultimate conditions. It was based in part on the Parking Study that showed the Parking Structure on the Triangle; the Parking Study was attached to and included in CUP 4153. The Resolution approved a waiver of the number of required parking spaces based on "information contained in the approved revised Parking Study" and was "contingent upon operation of the use in conformance with the assumptions relating to the operation and intensity of the use as contained in the Parking Study that formed the basis for approval of this waiver."

The Resolution also stated the Property was to be "developed substantially in accordance with the building layout and orientation, on-site parking and circulation,

5

structural setback and yard areas . . . shown on the plans and specifications . . . and the approved Final Site Plan." It depicted the hotel complex configuration, including Resort Development Standard building and landscape setbacks, landscaping, ingress and egress, and onsite parking, "and other Resort amenities."

After CUP 4153 was approved, plaintiffs submitted a noise study based on the Ultimate Site Plan, including the Parking Structure on the Triangle. About the same time, one of defendants' internal memos referenced the Project and CUP 4153 as permitting a hotel complex and a "2-level parking structure with wavier of minimum number of parking spaces and interior setback requirements."

Defendants had filed an eminent domain action in June 2009 to acquire a portion of the Property for construction of the Overpass. Defendants also acquired the adjacent properties, including the Triangle, by way of condemnation.

In 2011, just after the parties' mediation in the eminent domain action, defendants approved an "administrative amendment" (capitalization omitted; Amendment) to CUP 4153. The Amendment provided for constructing a surface parking lot on the Triangle to replace parking spaces taken from the Property to construct the Overpass. In a notice of exemption filed by defendants, they stated the request for the Amendment was for a determination that, upon their transfer of the Triangle to plaintiffs, parking would be "in substantial compliance" with CUP 4153. The proposed modified parking lot did not comply with the Resort Development Standards.

When plaintiffs learned of the Amendment they filed an appeal challenging the Amendment on several grounds, including that it had been adopted in secret without any notice or public hearing. Further, the Amendment approved a taking of rights plaintiffs had received upon enactment of CUP 4153. In addition, the modified parking permitted under the Amendment did not substantially comply with CUP 4153. Plaintiffs also asserted defendants were attempting to limit plaintiffs' just compensation for the taking of its Property for the Overpass.

6

Defendants subsequently rescinded the Amendment as "unnecessary" and in light of further review of its municipal code, beyond "staff's" authority, which may revoke but not modify a condition use permit (CUP). Defendants further advised that the parking lot they were constructing would comply with CUP 4153.

In 2011, while the Overpass was being constructed, defendants applied for CUP 5573 to build a parking lot on the Triangle. The application stated defendants would construct 62 parking spaces on the Property and 83 spaces in a standalone lot on the Triangle to mitigate the 142 spaces plaintiffs lost by virtue of defendants' taking of a portion of the Property for the Overpass. Defendants sought to eliminate the Parking Structure and construct the parking lot with reduced setbacks and landscaping less than what the Resort Development Standards required. Plaintiffs objected to this action. In June 2012, the planning commission adopted CUP 5573, which allowed the standalone parking lot with the reduced setbacks and landscaping not in conformance with Resort Development Standards and without the Parking Structure.

In 2013 defendants adopted a resolution to convey the Triangle to plaintiffs subject to several permanent easements for maintenance and access, walls, and subsurface foundation and utilities. The resolution noted defendants had built 83 parking spaces on the Triangle. It also stated conveyance was "in the best interest of" defendants and the "best way to feasibly mitigate the loss of parking on the [Property], to be assembled with the Hotel Site for hotel parking."

2. *The Petition, Trial, and Judgment*

Thereafter, plaintiffs filed a petition for writ of administrative mandate, seeking to have CUP 5573 invalidated. The petition alleged CUP 5573 was void or invalid because, among other things, it deprived plaintiffs of their fundamental rights granted in CUP 4153.

7

After trial, supported by a lengthy statement of decision, the court granted plaintiffs' petition to set aside CUP 5573. The court concluded defendants abused their discretion in enacting it.

The court found plaintiffs submitted the Parking Study and that it was provided to the planning commission as part of the staff report. The Parking Study concluded that a plan providing for 326 spaces would be sufficient. It recommended 376 spaces for the interim parking plan in use before the Overpass was constructed. After construction of the Overpass, there should be 355 spaces, of which 55 were to be in the two-story Parking Structure. The parties expected defendants would not only pay plaintiffs for the land it took for the Overpass but would also build the Parking Structure "on an adjacent parcel" to replace the spaces lost.

The court noted the Final Site Plan (*sic*),[2] on which CUP 4153 relied, shows the boundary of the Parking Structure on the southern edge of the property and extending onto the Triangle, which defendants were to purchase and deed to plaintiffs. The waivers of three requirements sought by plaintiffs, i.e., building setbacks, yard requirements, and parking spaces, were approved by the planning commission "'contingent upon operation of the use in conformance with the assumptions relating to the operation and intensity of the use as contained in the Parking Study that formed the basis for approval of this waiver.'"

The court additionally found that in 2011 defendants' planning department authorized the Amendment to CUP 4153, which stated a different configuration for the parking lot would be in "'substantial compliance'" with CUP 4153. The Amendment provided defendants would construct a surface parking lot containing sufficient spaces to

_____

[2] The court referred to a Final Site Plan throughout the statement of decision but it appears it was actually referring to the Ultimate Site Plan. In January 2000, subsequent to issuance of CUP 4153, plaintiffs submitted a Final Site Plan.

8

replace those plaintiffs lost in connection with the building of the Overpass. It would then convey the Triangle to plaintiffs.

Further, the court found, defendants rescinded the Amendment when plaintiffs objected to it. Defendants then enacted CUP 5573, which provided defendants would construct a surface parking lot with enough spaces to replace those plaintiffs lost. Defendants stated CUP 5573 was to assuage plaintiffs' concerns they might have that the Triangle property was nonconforming.

The court concluded the Ultimate Site Plan[3] encompassed in CUP 4153, as both sides agreed and recognized, included the Parking Structure to be built on the Triangle. The planning commission's approval of CUP 4153 referred to the Parking Study. The parties anticipated defendants would compensate plaintiffs for the land they took from them and would also construct the Parking Structure "on an adjacent parcel to replace parking spaces displaced by . . .[the Overpass]." The Final Site Plan (*sic*) referred to in the Parking Study plainly shows the footprint of the Parking Structure to be built on the Triangle.

The court also concluded the resolution enacting CUP 4153 stated the "'parking variance is contingent upon operation of the use in conformance with the assumptions and/or conclusions relating to the operation and intensity of use as contained in the revised Parking Study . . . and of which the parking structure on the [Triangle] is a part. Figure 2 of the . . . Parking Study' is the 'final project site plan, as proposed after construction of [the Overpass].'" Defendants at least implicitly conceded they were obligated to adhere to the Ultimate Site Plan by acquiring and then transferring the Triangle to plaintiffs. Plaintiffs had the right to rely on the Ultimate Site Plan and had and have an interest in defendants' acts as related to the Triangle.

---

[3] The trial court used the terms "ultimate plan" or ultimate design plan" instead of the term "Ultimate Site Plan." For clarity, we shall use the latter term.

9

The ruling held that, as a result, defendants were estopped to "unilaterally "change the [Ultimate Site Plan]' in 2012." Defendants knew of the ultimate condition when they issued CUP 4153. They referred to the Parking Study. The Final Site Plan (*sic*) depicted in the Parking Study showed the footprint of the Parking Structure on the Triangle. In approving the Final Site Plan (*sic*), defendants' intentions were "clear": they wanted the Project built.

Also clear, the court found, was plaintiffs' ignorance of the fact defendants would not live up to their agreement to build the Parking Structure. The parties had engaged in lengthy negotiations about the design of the Project. Based thereon, plaintiffs made a number of design changes, including a "significant" reduction in the number of rooms they would otherwise have been able to build based on the smaller setback, and constructed the Project for a cost of approximately $40 million. They did so in reliance on defendants' approval of the Final Site Plan (*sic*). Therefore defendants are bound by CUP 4153.

The court used an independent judicial standard of review, determining that for that purpose the evidence showed plaintiffs had a fundamental vested right. However, the court ruled that the result would be the same even if it used the substantial evidence standard.[4]

In sum, defendants were estopped from enacting CUP 5573.

## REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE PORTIONS OF REPLY BRIEF

Plaintiffs request we take judicial notice of a ruling (Ruling) in the related eminent domain action. In that case, the trial court relied heavily on its decision in the case before us, stating it had an "impact [on] the outcome of" the related case. The

---

[4] Because we conclude the court properly exercised its independent judgment, we need not explain the court's alternate reasoning using a substantial evidence standard. Nor do we discuss the parties' arguments on this issue.

10

Ruling stated that defendants could not relitigate the issues that had been decided in the current case. The Ruling held the Triangle with the surface parking lot "was not the 'mitigation' envisioned by both sides back in 1999." Thus, the court stated, it would not be equitable to allow defendants to put on evidence of that actual mitigation on the Triangle because it "was substantially different than both sides envisioned, as it would permit [defendants] to effectively benefit from [their] own wrongdoing." The court decided that, with one exception not relevant here, all evidence of the Triangle and "'planned mitigation'" would be excluded in the eminent domain trial.

Under Evidence Code section 452, subdivision (d) we may take judicial notice of records in other court actions. Defendants did not oppose the request and even cite to the Ruling in their reply brief. Therefore, we grant the request.

On September 25, nine months after the reply brief was filed and only one month before oral argument was scheduled, plaintiffs filed a motion to strike portions of defendants' reply brief. They challenge arguments allegedly not made in the opening brief and facts not included in the record dealing with the related eminent domain case.

We deny the motion to strike. First, counsel knew of these facts and arguments in January when the reply brief was filed and should have been aware that the court prepares cases, especially a case of this size, well ahead of oral argument. Second, if defendants included facts not in the record or arguments raised for the first time in the reply brief, we will determine on our own whether they should be considered.

**DISCUSSION**

*1. Standard of Review*

"Under Code of Civil Procedure section 1094.5, there are two alternative standards of review that a trial court uses to review a petition for writ of administrative mandamus. [Citation.] 'If the administrative decision involved or substantially affected a "fundamental vested right," the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the

11

administrative record for errors of law and exercise its independent judgment upon the evidence. [Citations.]' [Citations.] 'Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record. [Citation.]' [Citation.]" (*Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1280.)

Courts decide whether fundamental rights are involved on a case-by-case basis "and there is no fixed formula" for doing so. (*San Marcos Mobilehome Park Owners' Assn v. City of San Marcos* (1987) 192 Cal.App.3d 1492, 1499.) "'The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power.' [Citation.]" (*Benetatos v. City of Los Angeles, supra,* 235 Cal.App.4th at p. 1281.)

"'[F]undamental vested rights'" in the context of the standard of review "is not synonymous with . . . the 'vested rights' doctrine relating to land use and development." (*McCarthy v. California Tahoe Regional Planning Agency* (1982) 129 Cal.App.3d 222, 229-230.) As to the independent judgment standard of review, "'"'vested" has been used in a nontechnical sense to denote generally a right "already possessed" [citation] or "legitimately acquired." [Citation.] . . . In short, a vested right for review purposes means a preexisting right . . . ."'" (*Ibid.*)

Land use cases that apply the independent judgment standard of review "typically involve[] classic vested rights. [Citations.]" (*Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1527; *Goat Hill Tavern.*) Where a CUP has been issued and the landowner has relied on it to its detriment, the landowner has a vested right. (*Malibu Mountains Recreation, Inc. v. County of Los Angeles* (1998) 67 Cal.App.4th 359, 367.)

In *Anderson v. City of La Mesa* (1981) 118 Cal.App.3d 657, the defendant issued to the plaintiff a building permit that conformed to the zoning setback

12

requirements but not those in the specific plan.  After the plaintiff built her home in reliance on the permit, the defendant denied a zoning variance.  The trial court held the plaintiff's rights had vested and used an independent judgment standard of review.  (*Id*. at p. 660.)

Similarly, in *Stanson v. San Diego Coast Regional Com.* (1980) 101 Cal.App.3d 38, after the coastal commission advised the plaintiff he did not need a permit to remodel a building, he spent a large sum of money doing so.  When the coastal commission later denied the plaintiff's application for a permit, the appellate court ruled the trial court should have used an independent judgment test.  (*Id*. at p. 50.)

In *Goat Hill Tavern*, the plaintiff, which had been in business for 35 years, applied for a new CUP for the purpose of refurbishing the tavern.  The defendant issued a CUP with a six-month expiration date and the proviso a renewal could be requested; but on its expiration it refused to issue a renewal.  The plaintiff had invested more than $1.75 million to refurbish, including some substantial work done at the direction of the defendant.  Failure to renew the CUP would have resulted in its inability to continue to operate.  The court found the plaintiff had a fundamental vested right and held an independent judgment standard of review applied. (*Goat Hill Tavern*, *supra*, 6 Cal.App.4th at p. 1531.)

*Goat Hill Tavern* rejected the defendant's argument the plaintiff's rights were purely economic, which would dictate using a substantial evidence test. (*Goat Hill Tavern*, *supra*, 6 Cal.App.4th at p. 1529.)  "Interference with the right to continue an established business is far more serious than the interference a property owner experiences when denied a conditional use permit in the first instance."  (*Ibid*.)

"'Once a use permit has been properly issued the power of a municipality to revoke it is limited. . . .  Where a permit has been properly obtained and in reliance thereon the permittee has incurred material expense, he acquires a vested property right to

13

the protection of which he is entitled. [Citations.]'" (*Goat Hill Tavern*, *supra*, 6 Cal.App.4th at p. 1530.)

The trial court here engaged in independent judicial review, finding plaintiffs' fundamental vested rights were affected. Plaintiffs "located, designed, and invested more than $40 million to construct a certain number of rooms in their hotels, based on certain setback requirements and an '[Ultimate Site Plan]' inclusive of an anticipated [Parking S]tructure on the subject 'to-be-acquired' triangle parcel—with no dispute that significantly more rooms could have been constructed . . . , had a smaller setback been permitted." These factual findings are sufficient to support the court's use of independent judicial review.

On appeal, we use the substantial evidence test to review the factual bases of the trial court's decision, not those of the administrative hearing officer. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 218.) We consider "whether the evidence, viewed in the light most favorable to [plaintiffs], sustains the findings of the trial court, resolving any reasonable doubts in favor of those findings. [Citation.]" (*O'Toole v. Retirement Board* (1983) 139 Cal.App.3d 600, 602.) In so doing, however, we "'"'may look to the findings in [the administrative agency's] decision for guidance in determining whether the trial court's judgment is supported by substantial evidence." [Citation.]' [Citation.]" (*Green v. Board of Dental Examiners* (1996) 47 Cal.App.4th 786, 796.) Finally, we review questions of law de novo. (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204.)

2. *Equitable Estoppel*

The court held defendants were estopped from changing the Ultimate Site Plan approved in CUP 4153. That plan envisioned defendants compensating plaintiffs for the property taken to build the Overpass, constructing the Parking Structure on the Triangle, and using the same setback requirements as set out in CUP 4153. Thus,

14

defendants were bound by the provisions of CUP 4153 and were estopped from approving CUP 5573.

"'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.'" (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 489.)

"'"[E]quitable estoppel is founded on concepts of equity and fair dealing." [Citation.]'" (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1262; *Schafer*.) Equitable estoppel "'"ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy. [Citations.]" [Citation.]' [Citation.]" (*Ibid*.)

Defendants contend the court erred in several respects by finding estoppel.[5] Initially, they assert the court relied on a "mistaken version of the facts," relying on evidence that did not support the finding of estoppel. For example, they note the evidence on which the court relied to support its finding defendants would construct the Parking Structure was plaintiffs' internal memo and not a commitment from defendants. They stress that the Wood Letter, sent a day following that memo, said nothing about building a structure but mentioned only the "likelihood" of acquiring the Triangle. The Wood Letter further stated that in that event, defendants would convey the Triangle to plaintiffs for a credit against the cost of acquisition. Finally, defendants emphasize the Wood Letter contemplated a "binding agreement" between the parties.

---

[5] Defendants note the statement of decision did not specify the type of estoppel on which the court relied, and suggest "[n]either form of estoppel" applies. We are basing our decision on equitable estoppel, not promissory or judicial estoppel.

15

But these documents were not the final agreement between the parties and they were only part of the negotiations leading up to approval of CUP 4153. Further, they were only a small portion of the evidence in the extensive record that supports a finding defendants agreed to build the Parking Structure, not the least of which is CUP 4153 itself, which included the final Parking Study approved by defendants and showing the Parking Structure on the Triangle.

Defendants argue the Parking Study was limited in scope, i.e., only to ascertain the number of parking spaces needed, not to set out a layout of those spaces. They point to language in the Parking Study that states the "site plan is tentative." But the planning commission report approved the Parking Study, which included the Triangle and showed the Parking Structure. And the Parking Study was part of CUP 4153.

Defendants also take exception to the court's reference to the Ultimate Site Plan as the "'final project site plan,'" claiming the actual "Final Site Plan" did not include the Triangle. However, in listing the parking space requirements, the Final Site Plan did direct defendants to "REFER TO PARKING STUDY," which showed the Triangle and the Parking Structure.

Other evidence supporting the court's estoppel ruling includes, for example, a letter sent to plaintiffs by defendants' director of public works where he stated he would recommend approval of the Ultimate Site Plan showing "a 2-level parking structure." The subject matter of one of defendants' internal memos written shortly after CUP 4153 was approved showed there would be construction of the two hotels and "a 2-level parking structure."[6] The staff report to the planning commission regarding the Project approved the Parking Study, which showed the Parking Structure on the Triangle.

---

[6] Defendants claim this memo appears to describe an earlier version of the Project that was to contain a parking structure. This is at best contrary evidence and otherwise pure speculation, neither of which we consider.

16

Moreover, there was deposition testimony from defendants' senior planner that the entitlements for the Project included the approved Parking Study. He also testified the entitlements included the interim and ultimate conditions, the latter of which included the Parking Structure on the Triangle.

This is only some of the evidence supporting the court's finding and it is more than enough. When, as here, we are faced with a challenge to the sufficiency of the evidence we start with the presumption the judgment is correct. (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 957.) "'[T]he evidence [is viewed] in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference.'" (*Id*. at pp. 957-958 ) If "'"there is any substantial evidence, contradicted or uncontradicted," to support the findings,'" we "must uphold that finding." (*Ibid*.) We may not reweigh or resolve conflicts in the evidence or redetermine the credibility of witnesses. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) Thus, the other contrary facts defendants raise do not affect our conclusion.

The Parking Structure to be built by defendants on the Triangle was discussed throughout a good portion of the negotiations. Defendants point to no evidence where they refused to build it or even challenged the concept. The Parking Structure is shown in the interim and ultimate plans, and the approval of CUP 4153 was based on the approved Parking Study that included the Parking Structure.

We reject defendants' claim the court was "mistaken" in relying on the documents they challenge. Plaintiffs' internal memo and the Wood Letter provide the basis for a reasonable inference defendants agreed to build the Parking Structure. In any event, we review the court's result, not its reasoning. (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 101 Cal.App.4th 1317, 1325.) Finally, that there might be contrary evidence that could support defendants' position is irrelevant. It is necessary only that there be sufficient evidence to support the judgment. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873.)

17

Defendants also contend there is no evidence they misled plaintiffs about the true facts or made a promise on which plaintiffs could rely; and nothing in the record shows defendants promised to build the Parking Structure and convey the Triangle while "secret[ly]" planning to do otherwise. Defendants' arguments are simply additional challenges to the sufficiency of the evidence. The evidence recited above supports a finding that defendants made a promise, whether express or implied, on which plaintiffs reasonably relied.

Apparently recognizing the strength of that evidence, defendants contend that even if "some unnamed City employee" had made a promise to plaintiffs, it would not be enforceable. They cite *Burchett v. City of Newport Beach* (1995) 33 Cal.App.4th 1472, 1479, which states a government agency cannot be bound by an agent's acts in excess of his or her authority; and *Santa Monica Unified School District* (1970) 5 Cal.App.3d 945, 953, which holds a municipal agency cannot be estopped if its acts do not comply with the relevant statute.

But *Burchett* is not an estoppel case and neither fact situation applies. Defendants here had the power to approve compliance with the setback requirements demanded of plaintiffs. They also were authorized to approve constructing the Parking Structure on the Triangle and transferring it to plaintiffs.

Continuing with this theme, defendants assert their charter provides they can be bound only by a written contract approved by the council. (*Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1471, 1475 (*Poway*) [oral contract insufficient to bind the defendant and no exceptional circumstances to support promissory estoppel].) They point to the Wood Letter containing the statement a binding contract would be required and argue this prevents any justifiable reliance by plaintiffs.

In *Poway*, however, the only document on which the plaintiff relied was unsigned city council minutes. (*Poway*, *supra*, 149 Cal.App.4th at p. 1473.) Here, the

chair of the planning commission signed CUP 4153. Further, as discussed above, the Wood Letter was sent more than two months prior to approval of CUP 4153, and was part of the negotiations, not part of the final agreement between the parties.

In any event, defendants overstate the holding in *Poway*. Defendants' reading of *Poway* would mean the doctrine of estoppel could never be applied to a charter city, even in extraordinary circumstances. This is not the law.

The final estoppel element is plaintiffs' reliance to their detriment. And there is ample evidence proving this factor too.

Based on defendants' representations, plaintiffs agreed to develop the Project, spending over $40 million to do so. Pursuant to the Resort Development Standards and the larger setbacks due to land to be taken for the Overpass, plaintiffs were restricted to building 44 fewer rooms than they otherwise could have, thereby decreasing the value of the Project and their revenue. This also reduced the number of parking spaces available to them.

In addition, the Resort Development Standards required a 30-foot landscaped setback along one boundary; 36- to 49-foot wide building setbacks with a 10-foot wide landscaped area; a minimum 20-foot wide fully landscaped interior setback with 10 feet of landscaping and 10 feet of parking. Plaintiffs had to spend $500,000 for the "dense" landscape.

Plaintiffs expected the Triangle would also meet the Resort Development Standards to dovetail with the look of the hotels. Plaintiffs would not have developed the Project without having an agreement with defendants to this effect, including defendants' construction of the Parking Structure.

But instead, relying on CUP 5573, defendants constructed a surface parking lot on the Triangle rather than the agreed upon Parking Structure. Moreover, the Triangle does not meet any of the Resort Development Standards for setbacks and landscaping and does not coincide at all with the look of the Project. For example, compared to the

19

Project's required 20 feet of dense landscaping, defendants provided a net 23 inches of landscaping on the Triangle and almost a zero setback. Even one of the planning commissioners who voted against CUP 5573 "was very disappointed with what was built."

Moreover, the permanent easements on the Triangle for maintenance and access, walls, and subsurface foundation and utilities threaten plaintiffs' use and enjoyment of the Triangle.

Further defendants have profited from the Project. Since the hotels were built, defendants have received $2 million per year from their operation. Contrary to defendants' argument, the fact plaintiffs have made money on the Project is irrelevant. The requirement defendants meet their commitment is not dependent on plaintiffs' profitability.

In addition to showing plaintiffs' reliance to their detriment, these are certainly exceptional circumstances that would justify application of estoppel. (*Poway*, *supra*, 149 Cal.App.4th at pp. 1471, 1475.) Defendants' heavy reliance on *Schafer*, *supra*, 237 Cal.App.4th 1250 to argue the contrary does not persuade.

In *Schafer*, the party claiming estoppel (owner) had used property for a parking lot for over 50 years without having a certificate of occupancy for that purpose, though it complied with zoning. Thirty years later zoning was changed to eliminate parking lot use although the city did not challenge owner's use. In fact, both before and after the zoning change, at least twice the city informally confirmed approval of the parking lot, and almost 10 years after the zoning change, the city issued owner a permit to restripe. Several years thereafter, petitioners challenged owner's use because it was not permitted. The city denied the complaint, finding the parking lot had conformed to zoning when it was first built and restriping was approved because the parking lot was "an existing non-conforming use" that did not require a certificate of occupancy or permit.

20

Ultimately, the court of appeal held use as a parking lot could not be justified by application of equitable estoppel.  It reminded that in actions against government entities, in addition to finding sufficient evidence to satisfy the ordinary equitable estoppel factors, the court also must weigh "policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest.  [Citations.]" (*Schafer*, *supra*, 237 Cal.App.4th at p. 1263.)

As *Schafer* explained, "Particularly in land use cases, '[c]ourts have severely limited the application of estoppel . . . by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process.  [Citation.]  The overriding concern "is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits."  [Citation.]  Accordingly, estoppel can be invoked in the land use context in only "the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow."  [Citation.]' [Citation.]" (*Schafer*, *supra*, 237 Cal.App.4th at pp. 1262-1263.)

*Schafer* held there were no extraordinary circumstances justifying the application of estoppel.  (*Schafer*, *supra*, 237 Cal.App.4th at p. 1264.)  Even assuming owner was led to believe the city approved use of the property for a parking lot and owner reasonably relied on the city's representations by not applying for an occupancy certificate when it was available, owner would suffer no grave injustice that would justify avoiding the city's permit process.  (*Ibid*.)  To apply equitable estoppel would "undermine the strong public policy in favor of enforcing the substantive and procedural requirements for land use approvals.  [Citations.]" (*Ibid*.)

The facts in our case are not at all similar.  Plaintiffs are not sidestepping the application process or defendants' procedures nor are they receiving development or

21

other rights as a result of the application of estoppel. Rather, plaintiffs followed procedure and obtained necessary entitlements and permits, resulting in CUP 4153. There is no danger applying estoppel will set a precedent that will adversely affect public policy. Indeed it is defendants who are attempting to diverge from the agreement they made, and, in the process, deviate from the Resort Zone Standards to which the Resort Area and the Project are subject.

Moreover, without application of equitable estoppel, plaintiffs will suffer a grave injustice. As noted plaintiffs spent $40 million to develop the Project, despite losing a significant amount of the Property to defendants for the Overpass, and were induced to do so based on defendants' agreement to construct the Parking Structure and comply with Resort Development Standards on the Triangle.

As a corollary, plaintiffs are suffering a grave injustice, and defendants are obtaining a direct benefit from their agreement with plaintiffs. Not only are they receiving the substantial bed tax payments but construction of the Project stimulated the overall development of the Resort Area.

In short, *Schafer* supports plaintiffs' position, not defendants.'

Attacking from a different angle, defendants contend plaintiffs' reliance on defendants' alleged "tentative plans" was unreasonable as a matter of law, claiming their plan to build the Overpass was not formalized and had not been funded. This argument rings hollow.

The evidence shows defendants always intended to build the Overpass and had taken steps toward that end. They had begun eminent domain proceedings before approving CUP 4153 and had even determined the Overpass's exact location.[7] That location, which required taking part of plaintiffs' Property, had an impact on how

_____

[7] Defendants referred to the exact location of the Overpass as "precise alignment #114" and approved it in October 1999.

22

plaintiffs were able to develop the Property. As noted, plaintiffs were required to move the location of one of the hotel buildings, resulting in the loss of 44 rooms.

The Overpass also affected landscaping and parking, and plaintiffs were required to furnish site plans showing parking on the Property both before and after construction of the Overpass. The Resolution approving CUP 4153 specifically provides for the number of parking spaces before and after construction of the Overpass and states "the property is impacted by the future construction of [the Overpass]."

Whether defendants' plans were finalized or construction of the Overpass was funded is not relevant. Even if defendants never built the Overpass, their plan to do so negatively affected plaintiffs' Project. Plaintiffs bear no responsibility and should not be penalized for defendants' delay or problems in constructing the Overpass.

Defendants challenge the cases on which the court relied to apply equitable estoppel: *Times-Mirror Co. v. Superior Court* (1935) 3 Cal.2d 309 (*Times- Mirror*), *City of Torrance v. Superior Court* (1976) 16 Cal.3d 195 (*Torrance*), and *Hilltop Properties v. State of California* (1965) 233 Cal.App.2d 349 (*Hilltop*).

These were condemnation cases in which the condemning authority abandoned the action after the condemnee detrimentally relied on the condemnation and substantially changed its position. In *Times Mirror* and *Torrance*, the agency was prohibited from abandoning the proceeding because the condemnee could not be restored to substantially the same position. (*Times-Mirror*, *supra*, 3 Cal.2d at p. 334; *Torrance*, *supra*, 16 Cal.3d at pp. 209-210.) In *Hilltop*, an inverse condemnation case alleging similar facts, the court held the plaintiff had pleaded sufficient facts to proceed on a claim of promissory estoppel. (*Hilltop*, *supra*, 233 Cal.App.2d at p. 364.)

Defendants assert these cases do not apply because the rights protected in them are now codified in Code of Civil Procedure section 12685.510, subdivision (b). They also repeat their contention that governmental bodies are subject to estoppel only in extraordinary circumstances not found here.

23

Neither of these arguments persuades. First, the codification argument has no bearing on the matter. Second, as shown above, there are extraordinary circumstances justifying reliance on equitable estoppels in this case. Third, for the reasons stated above we also again reject the argument CUP 4153 was not a contract.

Similarly, defendants' assertion they have not abandoned the eminent domain action is irrelevant. Although *Times-Mirror* and the two other cases are set in a condemnation scenario, their import in this case is to illustrate that a public entity may be estopped from changing its position when the other party has substantially relied on it to its detriment.

Defendants also rely heavily on *Barthelemy v. Orange County Flood Control Dist.* (1998) 65 Cal.App.4th 558 (*Barthelemy*). There, the defendant's flood control plan included the plaintiffs' business property. When the plaintiffs learned the defendant planned to acquire their property and had already acquired surrounding properties, they elected to mitigate their damages by moving their business to different property. The defendant never acquired the plaintiffs' property. Plaintiffs' suit to recover damages for mitigation and relocation costs, was dismissed when the court granted judgment on the pleadings.

The court held the defendant's activities relative to the plaintiffs' property were not a sufficient basis on which the plaintiffs' could recover damages. It pointed to the fact the defendant had never enacted a resolution condemning the property. Rather, it held the plaintiffs' own conduct in moving their business caused their damages. (*Barthelemy*, *supra*, 65 Cal.App.4th at p. 571.)

But the facts in the case before us are plainly different. It does not matter whether defendants had taken all the steps necessary to construct the Overpass at the time CUP 4153 was passed. CUP 4153 was adopted on the premise the Overpass would be constructed, and plaintiffs were constrained by that planned construction in developing the Project.

24

The same distinction applies to *Joffe v. City of Huntington Park* (2011) 201 Cal.App.4th 492 (*Joffe*). In *Joffe*, the plaintiffs' property was in an area the defendant intended to acquire either through purchase or eminent domain for development of a shopping center. City officials made statements to this effect over a period of six years and took other actions, including having the plaintiffs' property and business appraised. However, the city never announced it would condemn the property. The plaintiffs filed an inverse condemnation action, which was dismissed after the court sustained a demurrer.

Defendants rely on the *Joffe* court's statement, in finding the plaintiffs had not sufficiently pleaded promissory estoppel, that the plaintiffs could not reasonably rely on city officials' representations because planning for the project was "simply not far enough along." (*Joffe, supra*, 201 Cal.App.4th at p. 513.) Here again, our facts are different. Defendants were much further ahead in building the Overpass, and plaintiffs acted not just on oral representations but on CUP 4153.

Taking another tack, defendants argue plaintiffs had no vested right in the Triangle for four reasons. First, they contend, CUP 4153 does not apply to the Triangle; it encompasses only the Property. Defendants point to the site plan, part of the staff report recommending issuance of CUP 4153, which does not show the Triangle. But that staff report also shows the number of parking spaces before and after construction of the Overpass and states that the waiver of the total number of parking spaces "is contingent upon operation of the use in conformance with the assumptions and/or conclusions relating to the operation and intensity of use as contained in the revised Parking Study . . . that form the basis for approval of said waiver." Of course, the Parking Study contains the Triangle and shows the Parking Structure.

Second, defendants assert, at the time CUP 4153 was passed defendants did not own the Triangle. Rather it was owned by a third-party who did not participate in the CUP 4153 application, raising "serious due process implications" because the then-owner

did not get notice. But according to the Resolution approving CUP 4153, notice of the hearing on adoption of CUP 4153 was sent to the public and there were no objections.

Further, the argument is flimsy, at best. In CUP 4153 defendants approved the parking plan that would go into effect after construction of the Overpass. That plan included parking on the Triangle. It assumed defendants would acquire the Triangle property. And defendants intended to acquire that property because they needed it to construct the Overpass. If it violated due process, defendants would not have been able to approve plaintiffs' use of the Triangle for replacement parking. The Triangle is the only way plaintiffs would have been able to meet the number of parking spaces required in CUP 4153. In addition, we question, without deciding, whether defendants even have standing to assert a third party's alleged due process rights.

Defendants' third argument is that CUP 4153 does not approve a specific parking layout, despite the inclusion of the Parking Study with the plan showing the Parking Structure. They claim the Parking Study was included only to support the waiver of the number of required parking spaces. But this is contrary to the trial court's findings, for which there was sufficient evidence as set out above. As noted, that there was contrary evidence that might support defendant's position is irrelevant. (*Bowers v. Bernards*, *supra*, 150 Cal.App.3d at p. 873.)

Fourth, defendants contend CUP 4153 did not give plaintiffs a vested right to build on the Triangle. That, they maintain, would require a permit. And even if CUP 4153 did give plaintiffs a right to build on the Triangle, that right could not prevent defendants from approving entitlements for a use other than a parking structure.

But defendants miss the point. Plaintiffs are not seeking to build on the Triangle. Rather, they wanted defendants to live up to their agreement to build the Parking Structure on the Triangle in compliance with the Resort Development Standards for setbacks and landscaping.

26

Apparently acknowledging that demand, defendants argue CUP 4153 could not require them to obtain the Triangle, build the Parking Structure in compliance with applicable setbacks, and transfer the Triangle to plaintiffs. They argue CUP 4153 was not a contract obligating them to do so, but was simply a permit.

But again that is not the issue. The decision here is that pursuant to CUP 4153, defendants' statements and actions, and plaintiffs' reliance thereon, defendants are estopped from enacting and relying on CUP 5573 to eliminate their obligation to construct the Parking Structure on the Triangle using the same setback and landscaping requirements as those required of plaintiffs. And, as discussed above, the statement in the Wood Letter that a written agreement would be required is, first of all, contrary evidence. Second, as defendants themselves emphasize, that letter was merely part of the parties' discussions two months before CUP 4153 was issued. The cases they cite holding that various licenses and permits are not contracts are inapt.

The existence of the related eminent domain action and alleged potential compensation to plaintiffs for defendants' enactment of CUP 5573 and construction of the surface parking lot on the Triangle with minimal setbacks and landscaping are not relevant and do not change the outcome in this case.

In sum, the trial court properly granted plaintiffs' petition to set aside CUP 5573. "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach v. Mansell*, *supra*, 3 Cal.3d at pp. 496-497.) Such is the case here.

27

## DISPOSITION

The judgment is affirmed.  The request for judicial notice is granted.  The motion to strike portions of reply brief is denied.  Plaintiffs are entitled to costs on appeal.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

28